**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO. 04-80158-CIV-DIMITROULEAS/LYNCH**

JOSEPH AND PATRICIA MARRARI, on
behalf of themselves and all others similarly
situated,

       Plaintiffs,

vs.

MEDICAL STAFFING NETWORK
HOLDINGS, INC., et al.

       Defendants.

_____

**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND**
**INCORPORATED MEMORANDUM OF LAW IN SUPPORT THEREOF**

# TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ...................................................................................................1

SUMMARY OF UNDISPUTED FACTS ......................................................................................3

    A.     The Complaint ................................................................................................3

    B.     Background ....................................................................................................3

    C.     Initial Public Offering....................................................................................4

    D.     The Company's Post-IPO Public Disclosures .........................................................4

    E.     The Company's Restructuring .................................................................................5

ARGUMENT ................................................................................................................................5

I.     No Genuine Issue of Material Fact Exists As To Plaintiff's Claims Under Section 11 of the Securities Act. .................................................................................5

    A.     The Prospectus Did Not Contain Any Material Misrepresentation Or Omission. .................................................................................................6

        1.     The Company Did Not Misrepresent the Status of the *De Novo* Program..................................................................................6

        2.     The Prospectus Did Not Misrepresent Any Facts Concerning the Company's Internal Budgets..........................................................8

    B.     The Undisputed Evidence Establishes the Individual Defendants' "Due Diligence" Defense. ...................................................................................9

II.     The Undisputed Evidence Demonstrates that the Individual Defendants Are Not Liable As Control Persons Under Section 15 of the Securities Act.............................................10

III.     Defendants Are Entitled To Summary Judgment Because No Genuine Issues Of Material Fact Exist As To Plaintiff's Exchange Act Claims..........................................................11

    A.     The Company's Public Disclosures Did Not Contain Any Material Misstatement or Omission. ...........................................................................12

        1.     The Company's Statements Concerning the *De Novo* Program Were Not Misleading. ...........................................................12

2.  The Company's Statements Concerning Its Gross Margins Were Not Misleading..................................................................................14

3.  The Company Had A Reasonable Basis for Issuing Its Revenue and Earnings Guidance. .................................................................15

4.  The Company's Statements Concerning Its Restructuring and Branch Closures Were Not Misleading. ...........................................17

5.  The Company's 2002 Form 10-K Did Not Contain Any Other Material Misrepresentations or Omissions. .................................18

B.  None of The Defendants Acted With Scienter. ....................................................19

IV.  Plaintiff's Control Person Claims Against Defendants Adamson and Little Under Section 20(a) Must Be Dismissed..................................................................................20

CONCLUSION...................................................................................................................20

## TABLE OF AUTHORITIES

### CASES

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) ......................................................5

*In re Avant-Garde Computing Inc. Sec. Litig.*, Civ. No. 85-4149 (AET),
1989 WL 103625 (D.N.J. Sep. 5, 1989) ..........................................................................9

*Bond Opportunity Fund v. Unilab Corp.*, 99 Civ. 11074  2003 WL 21058251
(S.D.N.Y. May 9, 2003) ....................................................................................................6

*Brown v. Enstar Group, Inc.*, 84 F.3d 393 (11th Cir. 1996) .......................................11

*In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410 (3d Cir. 1997) .....................14

*Cameron v. Outdoor Resorts of Am., Inc.*, 608 F.2d 187 (5th Cir. 1979) .....................11

*Donohoe v. Consol. Operating & Prod. Corp.*, 30 F.3d 907 (7th Cir. 1994) ................20

*Ehlert v. Singer*, 245 F.3d 1313 (11th Cir. 2001) .......................................................10

*Harris v. Ivax Corp.*, 182 F.3d 799 (11th Cir. 1999), *reh'g. denied*, 2000 WL 430031
(11th Cir. Apr. 20, 2000) ........................................................................................ 16-17

*Hinerfeld v. United Auto Group*, No. 97 Civ. 3533 (RPP), 1998 WL 397852
(S.D.N.Y. July 15, 1998) ..................................................................................................7

*Laven v. Flanagan*, 695 F. Supp. 800 (D.N.J. 1988) ....................................................9

*Longman v. Food Lion, Inc.*, 197 F.3d 675 (4th Cir. 1999) ........................................18

*In re Metris Cos., Inc. Sec. Litig.*, 428 F. Supp. 2d 1004 (D. Minn. 2006) ............12, 20

*In re Miller Indus. Sec. Litig.*, 120 F. Supp. 2d 1371 (N.D. Ga. 2000) ................. 19-20

*Oxford Asset MGMT. v. Jaharis*, 297 F.3d 1182 (11th Cir. 2002) ................................5

*Palmer v. Gotta Have It Golf Collectibles, Inc.*, 106 F. Supp. 2d 1289 (S.D. Fla. 2000) ...............5

*In re Rexall Sundown, Inc. Sec. Litig.*, No. 988798-CIV-DIMITROULEAS,
2000 WL 33539428 (S.D. Fla. Mar. 29, 2000) ..............................................................17

*Rombach v. Chang*, 355 F.3d 164 (2d Cir. 2004) ........................................................12

*Saddle Rock Partners, Ltd. v. Hiatt*, No. 95-2326 GA, 1996 WL 859986
(W.D. Tenn. Mar. 26, 1996) ...........................................................................................14

iii

*Schuster v. Symmetricon, Inc.*, Civ. No. C94 20024 RMW, 2000 WL 33115909
(N.D. Cal. Aug. 1, 2000)...........................................................................................19

*Stavroff v. Meyo*, 987 F. Supp. 987 (N.D. Ohio 1995), <u>aff'd</u>, No. 95-4118,
1997 WL 720475 (6th Cir. Nov. 12, 1997)...................................................... *passim*

*TAAM Assocs v. Housecall Med. Res., Inc.*, 1:96-C 1998 WL. 1745361
(N.D. Ga. Mar. 31, 1998)..........................................................................................14

*Theoharous v. Fong*, 256 F.3d 1219 (11th Cir. 2001) ..................................... 11-12, 17

*Weinberger v. Jackson*, No. C-89-2301-CAL, 1990 WL 260676 (N.D. Cal. Oct. 11,
1990) .........................................................................................................................10

*In re World Access, Inc. Sec. Litig.*, 310 F. Supp. 2d 1281 (N.D. Ga. 2004) ....................... *passim*

## STATUTES

15 U.S.C. § 77k.........................................................................................................5

15 U.S.C. § 77k(b)(3) ................................................................................................9

15 U.S.C. § 77k(c) .....................................................................................................9

15 U.S.C. § 77o...................................................................................................10, 11

15 U.S.C. §78u-5(c)(1)(A)(i) ...............................................................................16-17

17 C.F.R §230.176 ....................................................................................................9

Fed. R. Civ. P. 56(c) .................................................................................................5

Pursuant to Fed. R. Civ. P. 56.1 and S.D. Fla. L.R. 7.5, Defendants Medical Staffing Network Holdings, Inc., Robert J. Adamson, Kevin S. Little, Joel Ackerman, David J. Wenstrup and Scott F. Hilinski (collectively, the "Defendants") hereby move this Court for summary judgment in their favor on all claims in this action.[1]  In support of this Motion, Defendants respectfully refer the Court to the incorporated memorandum of law.[2]

## PRELIMINARY STATEMENT

As this Court observed in its decision on Defendants' Motion to Dismiss, Plaintiff alleges in his Section 11 claim that MSN's "Registration Statement and Prospectus depicted MSN's *de novo* program, a key element in the company's growth strategy, as being financially successful when in fact that program was not generating positive growth and was only making fifty-percent of its projections."  Order Granting, In Part, Motion To Dismiss The Consolidated Amended Class Action Complaint; And Granting Leave To Amend (the "Motion to Dismiss Order") at 2. Similarly, the Court noted that Plaintiff's Section 10(b) claim seeks redress for allegedly "misleading statements made to the public concerning the performance of the *de novo* program." Motion to Dismiss Order at 18.  Specifically, the Court observed that the Complaint alleges that Defendants "inflat[ed] internal forecasts and communicat[ed] these manipulated numbers to the public," that the Company "used these manipulated numbers to portray itself as bucking the downward market trend," and that it "continued to raise its earnings estimates [] even after it planned to start closing *de novo* branches."  Motion to Dismiss Order at 19-20.

---

[1]    On November 21, 2006 the parties submitted a Joint Notice of Settlement and Motion to Stay Proceedings. [D.E. 108.]  Subsequently, the parties received the Court's Order Granting, In Part, Motion To Extend the Deadline for Dispositive Motions [D.E. 109] (the "Order"), granting the parties up to and including December 1, 2006 to file either their joint stipulation for dismissal, or their motions for summary judgment. Following the mediation on November 20, the parties have been working diligently to complete the settlement papers required to comply with Fed. R. Civ. P. 23.  It is anticipated that the settlement papers will be finalized and submitted to the Court during the week of December 4.  Because the parties have not been able to complete the settlement papers by December 1, 2006, Defendants are submitting their motion for summary judgment as required by the Order.

[2]    Defendants also submit in support of this Motion the Declarations of Robert J. Adamson (the "Adamson Decl."), Kevin S. Little (the "Little Decl."), Joel Ackerman (the "Ackerman Decl."), Raymond Cooper (the "Cooper Decl."), Scott F. Hilinski (the "Hilinski Decl."), David J. Wenstrup (the "Wenstrup Decl."), and Sameer Advani (the "Advani Decl.").

Discovery is now complete. Defendants are entitled to summary judgment because Plaintiff cannot prove any of his claims. In the first place, Plaintiff's Securities Act and Exchange Act claims fail because the undisputed evidence demonstrates neither the Company's IPO Prospectus nor its subsequent public disclosures misrepresented or failed to disclose any material facts. That evidence establishes -- contrary to the Complaint's allegations -- that the Company's *de novo* program was successful prior to the IPO, throughout 2002 and during the first quarter of 2003. At all times during this period, the *de novo* program generated substantial revenue growth and profitability. That evidence also establishes -- again contrary to Plaintiff's contention -- that the Company did not communicate any allegedly inflated budgets to the public. In fact, the Company's internal budgets, which were used as a management tool and to determine the bonuses of employees, were never publicly disclosed. Beginning in late July 2002, well after the IPO, the Company did disclose "guidance" to the markets of expected revenues and earnings. That guidance was substantially lower than the Company's internal budget, was prepared in an entirely different manner than the budget and was based on reasonable assumptions. Indeed, the Company met or exceeded its revenue guidance for 2002 and the first quarter of 2003 and, excluding an unexpected one-time charge in the fourth quarter of 2002, met or exceeded its earnings guidance during this period as well.

Plaintiff's Section 11 claim against the Individual Defendants must be dismissed for an additional reason. The undisputed evidence demonstrates that each of these Defendants conducted appropriate due diligence prior to the IPO and had no reasonable ground to believe and did not believe that the Prospectus contained any material misrepresentation or omission. Plaintiff's control person claims under Section 15 of the Securities Act against the Individual Defendants also have no factual basis. In addition to the fact that there was no substantive violation of Section 11 by the Company on which a Section 15 claim could be based, Plaintiff cannot demonstrate that the Company's three Independent Directors were control persons or that any of the Individual Defendants had knowledge or reasonable grounds to believe in the existence of facts by reason of which the liability of the Company is alleged to exist.

Plaintiff's claims under Section 10(b) against the Company and against Adamson and Little also must be dismissed because the undisputed evidence demonstrates that these

Defendants did not act with scienter. These same facts require the dismissal of Plaintiff's controlling person claim against Adamson and Little under Section 20(a) of the Exchange Act.

## SUMMARY OF UNDISPUTED FACTS[3]

### A.    The Complaint

Thomas Greene, the lead plaintiff, brings this class action on behalf of himself and all persons who purchased or otherwise acquired MSN common stock between April 18, 2002 and June 16, 2003, inclusive (the "Class Period"). Plaintiff's Consolidated Class Action Complaint (the "Complaint") asserts claims purportedly arising under the Securities Act of 1933 (Sections 11 and 15, 15 U.S.C. §§ 77k, 77o) (the "Securities Act Claims") and the Securities Exchange Act of 1934 (Sections 10(b) and 20(a), 15 U.S.C. §§ 78j(b), 78t(a)), and Rule 10b-5 promulgated thereunder (17 C.F.R. § 240.10b-5) (the "Exchange Act Claims"). Compl. ¶ 2.

In November 2004, Defendants moved to dismiss the Complaint for failure to state a claim upon which relief can be granted. The Court denied in part, and granted in part, that motion. It denied the motion with respect to Plaintiff's Securities Act Claims, but dismissed the Exchange Act Claims as to any statements made before October 29, 2002. Motion to Dismiss Order at 29-30.

### B.    Background

MSN is a supplemental healthcare staffing company, founded in 1998, that provides hospitals and other healthcare facilities with staffing services. SMF ¶ 5. As of December 29, 2002, the Company had over 180 branches in 44 states. SMF ¶ 7; Compl. ¶ 3. The Company refers to branches it opens, as opposed to those acquired from third-parties, as *de novo* branches. SMF ¶ 7. From its inception in 1998 through the end of 2002, the Company opened 138 *de novo* branches, including 30 in 2000, 64 in 2001 and 40 in 2002. SMF ¶ 7.

During the Class Period, Defendant Adamson was a director of MSN and its Chairman and Chief Executive Officer and Defendant Little was its Chief Financial Officer. SMF ¶¶ 2-3.

---

[3]    The facts on which Defendants' motion is based, and the evidence demonstrating that there are no genuine issues to be tried as to those facts, are set forth in Defendants' Statement of Material Facts As To Which There Is No Genuine Issue To Be Tried ("SMF"), filed concurrently herewith.

Defendants Ackerman, Wenstrup and Hilinski were members of the Board of Directors (the "Independent Directors"). SMF ¶4. Each was an independent, non-management, director. Ackerman Decl., ¶ 5; Hilinski Decl., ¶ 3; Wenstrup Decl., ¶ 11.

### C.    Initial Public Offering

On April 18, 2002, the Company completed an initial public offering ("IPO"). In connection with the IPO, the Company filed with the Securities and Exchange Commission (the "SEC") a registration statement and prospectus (the "Prospectus"), which became effective on April 18, 2002. SMF ¶ 8.

The Company's most recent audited financial statements and unaudited quarterly operating results for fiscal years 2000 and 2001, were included in the Prospectus. SMF ¶ 10. The Company's financial statements were accurate in all material respects. SMF ¶ 11. Those financial statements demonstrate that the Company's revenues, EBITDA (earnings before interest, taxes, depreciation and amortization) and income from operations increased substantially each year from 1999 to 2001 and in the first quarter of 2002, SMF ¶¶12-13, and that the Company's gross margins similarly increased over the same period. SMF ¶¶ 22-23. The evidence further establishes that the Company's *de novo* program, like the Company as a whole, performed extremely well prior to the IPO, consistently exhibiting revenue growth and profitability. SMF ¶¶ 14-15.

### D.    The Company's Post-IPO Public Disclosures

Between October 29, 2002 and June 16, 2003, the Company issued several press releases, made SEC filings and hosted conference calls with analysts that Plaintiff alleges were misleading (collectively, the "Public Disclosures"). SMF ¶¶ 33-36. Like the financial results reported in the Prospectus, the financial information reported in the Company's Public Disclosures was accurate and timely. SMF ¶ 37. Those financial results demonstrate conclusively that after the IPO and through the first quarter of 2003, the Company continued to perform well with revenues and profitability growing substantially. SMF ¶¶ 38-43. The undisputed evidence also demonstrates that the *de novo* program, a key component of the Company's operations, continued to be successful, exhibiting rapid growth and generating considerable profits. SMF ¶¶ 44-46.

### E.     The Company's Restructuring

As a result of changes in the market for per diem services, in or around late April or early May 2003, the Company decided to suspend further *de novo* branch openings and restructure its operations.  SMF ¶ 60.  On May 12, 2003, the Company issued a press release announcing the restructuring and disclosing that it was taking a charge related to the restructuring.  Compl. ¶263.  The Company also withdrew its previously issued guidance.  At the time of the May 12 press release, neither the number nor identity of the branches that were going to be closed had been determined.  SMF ¶ 60.  Subsequently, on June 16, 2003, the Company issued a press release disclosing further information about the restructuring including the number of branches that were closed and the Company's efforts to retain revenue from those branches.  Compl. ¶ 268.  The press release also contained the Company's revised guidance for 2003.  SMF ¶ 52.

## ARGUMENT

A motion for summary judgment should be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits . . . show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of material fact." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986) (emphasis in original).  "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." Id. at 249-50 (internal citations omitted).  Summary judgment "cannot be defeated with mere speculation and conjecture." Palmer v. Gotta Have It Golf Collectibles, Inc., 106 F. Supp. 2d 1289, 1301 n.22 (S.D. Fla. 2000)  (citing Blackston v. Shook & Fletcher Insulation Co., 764 F.2d 1480, 1482 (11th Cir. 1985)).

## I.     No Genuine Issue of Material Fact Exists As To Plaintiff's Claims Under Section 11 of the Securities Act.

To prevail on a Section 11 claim, a plaintiff must prove that the prospectus contained an untrue statement of a material fact or omitted to state a material fact <u>required</u> to be stated therein or necessary to make the statements made therein not misleading.  15 U.S.C. § 77k (emphasis added); Oxford Asset Mgmt. v. Jaharis, 297 F.3d 1182, 1188 (11th Cir. 2002).  In determining

-5-

materiality, an issuer's disclosures "need not be perfect," but instead need only "convey a sufficiently accurate picture so as not to mislead." <u>Bond Opportunity Fund v. Unilab Corp.</u>, 99 Civ. 11074 (JSM), 2003 WL 21058251, at *4 (S.D.N.Y. May 9, 2003) (explaining materiality requirement under federal securities laws in context of an allegedly misleading proxy statement). If a plaintiff is unable to proffer colorable evidence on any of the requisite elements, summary judgment is warranted. <u>See In re World Access, Inc. Sec. Litig.</u>, 310 F. Supp. 2d 1281, 1298 (N.D. Ga. 2004) (granting defendants summary judgment on section 11 claim where no genuine issue of material fact existed regarding whether defendants' statements were false or contained an omission).

Here, Plaintiff cannot establish that the Prospectus misrepresented or omitted any material fact.

**A.    The Prospectus Did Not Contain Any Material Misrepresentation Or Omission.**

**1.    The Company Did Not Misrepresent the Status of the *De Novo* Program.**

The nub of Plaintiff's Section 11 claim is that the Prospectus did not accurately disclose the condition of the Company's *de novo* program because the *de novo* program "was not succeeding", not generating "high growth" or "rapid EBITDA profitability", was "in shambles" and was consistently operating approximately 50% below budget. Compl. ¶101. Plaintiff also alleges that the Prospectus did not disclose that the Company faced "severe margin compression" that adversely affected its growth prospects and performance. Compl. ¶¶101, 102. There is no factual support for any of these allegations. On the contrary, the undisputed evidence establishes that, at the time of the IPO, the Company's *de novo* program was highly successful.

From its founding in 1998 through the time of the IPO in April 2002, the Company's financial performance was exceptional with revenues and profits substantially increasing both sequentially and year-over-year. SMF ¶¶ 12-13. For example, the Company's revenues increased from $96.5 million in 1999 to $182 million in 2000 (representing an 88.6% increase), and to $338.4 million in 2001 (representing an 85.9% increase). SMF ¶ 12. Income from operations increased from $5.0 million in 1999 to $10.6 million in 2000 (110.6% increase), and to $19.4 million in 2001 (83.0% increase). SMF ¶ 12. During the first quarter of 2002, revenues

-6-

and income from operations grew by 46.4% and 46.7% over the first quarter of 2001, respectively. SMF ¶ 13.

Similarly, the Company's *de novo* program did extremely well. The Company opened more than 100 *de novo* branches during this period. SMF ¶ 7. These branches exhibited rapid growth and profitability. SMF ¶ 15. Thus, *de novo* branches that were opened in 1999 generated $9.2 million in revenues in 2000, representing a 240.7% increase over 1999. SMF ¶ 16. These same branches generated revenues of $13.3 million in 2001. SMF ¶ 16. *De novo* branches opened in 2000 contributed $48.9 million in revenues in 2001 as compared to $10.0 million in 2000. SMF ¶ 16. In the first quarter of 2002, revenues for the *de novo* program increased by 173.1% to $39.6 million over the first quarter of 2001. SMF ¶ 17. The profitability of the *de novo* branches was also substantial and increased over this period. Operating income for *de novo* branches increased by 547.5% in 2001 over 2000. SMF ¶ 16. For the first quarter of 2002, operating income grew 135.7% over the same period in 2001. SMF ¶ 17. Moreover, rather than consistently operating at 50% below internal budgets as Plaintiff alleges, the *de novo* branches in fact exceeded the Company's internal budgets in 2001 and the first quarter of 2002. SMF ¶ 18.

Accordingly, undisputed facts completely undermine the Complaint's allegation that at the time of the IPO the *de novo* branches were not succeeding and were "in shambles."

The Complaint's allegation that the Prospectus failed to disclose that the Company "faced severe pricing pressure from both clients and nurses" (e.g., Compl. ¶¶ 53, 101(b)) also lacks any factual basis. In fact, the Company's gross margins increased from 24.4% in 1999 to 25.5% at the time of the IPO. SMF ¶ 22. These numbers belie any claim that the Company faced "severe pricing pressure" at the time of the IPO. Moreover, the disclosure of this gross margin information in the Prospectus conclusively demonstrates that there is no basis for Plaintiff's non-disclosure claim. See Hinerfeld v. United Auto Group, No. 97 Civ. 3533 (RPP), 1998 WL 397852, at * 4 (S.D.N.Y. July 15, 1998) ("Courts will dismiss claims under [the Securities Act] if they charge omissions of what was in fact disclosed.") (citing Olkey v. Hyperion 1999 Term Trust, Inc., 98 F.3d 2, 9 (2d Cir. 1996)).

Finally, the Complaint alleges that the Prospectus failed to disclose that MSN "had no plan as to where its *de novo* offices should open." The evidence demonstrates, however, that the

Company had such a plan and that it was reasonable and effective. The *de novo* program was designed to grow incrementally outward from Florida. Little Decl., ¶ 9. In targeting specific regions for growth, the Company attempted to leverage administrative, marketing and management resources over geographically concentrated clusters of branches. Little Decl., ¶ 9. Potential locations were based on population density, concentration of healthcare facilities, level of temporary medical staffing usage, and the presence of competitors. Little Decl., ¶ 11. The Company then sought a good branch manager in potential targeted locations. Such a branch manager was critical to the success of the branches. Little Decl., ¶ 13. The Prospectus specifically disclosed that in deciding where to open new *de novo* branches, the Company focused on "identifying management for the branch" and on selecting markets that "demonstrate[d] high demand for temporary medical staffing" and that "compliment[ed the Company's] existing infrastructure." SMF ¶ 21.

> ## 2. The Prospectus Did Not Misrepresent Any Facts Concerning the Company's Internal Budgets.

The Complaint also alleges that the Company's budgets were "wholly unreliable, arbitrary, and designed to mislead the market," and were "manipulated" to "create the illusion of growth." Compl. ¶¶ 53, 101. There is no factual support for these allegations either. The Company's internal budgets could not have created the appearance of growth because it is undisputed that they were not included in the Prospectus. SMF ¶ 26; Stavroff v. Meyo, 987 F. Supp. 987, 997 (N.D. Ohio 1995), aff'd, No. 95-4118, 1997 WL 720475 (6th Cir. Nov. 12, 1997) (holding that since "[t]he Budget was not released to the public … it cannot form the basis for any claim of being misled by public information").

*    *    *

In sum, the Prospectus accurately disclosed all material facts required to be disclosed and did not omit to state any material facts necessary to make statements made in the Prospectus not misleading. Summary judgment is, therefore, warranted on the Section 11 claim.

**B.    The Undisputed Evidence Establishes the Individual Defendants' "Due Diligence" Defense.**

Even if the Prospectus had contained material misrepresentations -- which it did not -- each of the Individual Defendants would still be entitled to summary judgment on the Section 11 claim based on the "due diligence" defense. 15 U.S.C. § 77k(b)(3).[4]

In determining what constitutes reasonable investigation and reasonable ground for belief for purposes of the due diligence defense, the standard of reasonableness is the standard required of a prudent man in the management of his own property. 15 U.S.C. § 77k(c). In assessing this defense, courts consider whether the defendant was an officer and, if so, the office held, whether a defendant was an outside director, the steps taken by the defendant to obtain information, and a defendant's reasonable reliance on officers, employees, and others whose duties should have given them knowledge of the particular facts. 17 C.F.R §230.176. See also In re Avant-Garde Computing Inc. Sec. Litig., Civ. No. 85-4149 (AET), 1989 WL 103625, at *8-9 (D.N.J. Sep. 5, 1989) (granting summary judgment on due diligence defense and holding relevant facts included participation in board meetings, knowledge that an accounting firm found company's financial statements in conformity with GAAP, and review of drafts of the prospectus); Laven v. Flanagan, 695 F. Supp. 800, 812 (D.N.J. 1988) (outside directors are "under a lesser obligation to conduct a painstaking investigation than an inside director with intimate knowledge of the corporation").

Here, each of the Individual Defendants has established his due diligence defense. As to the Independent Directors, they informed themselves about the temporary nurse staffing industry, and the Company's management team, historical financial results, current financial position, operations (including the *de novo* program) and future prospects by reviewing Company documents, considering industry data, and discussing the Company with management

---

[4]    Section 11 provides in pertinent part: "No person, other than the issuer, shall be liable under section 11 who shall sustain the burden of proof that:

(A) as regards any part of the registration statement not purporting to be made on the authority of an expert, … he had, after reasonable investigation, reasonable ground to believe and did believe, at the time such part of the registration statement became effective, that the statements therein were true and that there was no omission to state a material fact required to be stated therein or necessary to make the statements therein not misleading. . . ."

-9-

and the Company's auditors. Ackerman Decl., ¶¶ 3-9; Hilinski Decl., ¶¶ 7-20; Wenstrup Decl., ¶¶ 4-17. Each of the Independent Directors also reviewed drafts of the Prospectus and each concluded that it was accurate and complete. Ackerman Decl., ¶ 9; Hilinski Decl., ¶ 20; Wenstrup Decl., ¶ 17. This undisputed evidence is more than sufficient to establish due diligence. See Weinberger v. Jackson, No. C-89-2301-CAL, 1990 WL 260676 at *4-5 (N.D. Cal. Oct. 11, 1990) (summary judgment granted where outside director reviewed drafts of registration statement and discussed them with management, and also was given comfort by the fact that prospectus was reviewed by underwriters and counsel).

As to Adamson and Little, there is no dispute that both were thoroughly familiar with the financial performance and operations of the Company, including the *de novo* program. Adamson Decl., ¶ 5; Little Decl., ¶ 24. Adamson and Little also reviewed drafts of the Prospectus and they, too, concluded it was accurate and did not omit any material information. SMF ¶ 29.

Accordingly, based on a reasonable investigation, each of the Individual Defendants had reasonable grounds to believe and did believe, at the time the Prospectus became effective, that the statements therein were true and did not omit any material facts.[5] SMF ¶¶ 28-29.

## II.    The Undisputed Evidence Demonstrates that the Individual Defendants Are Not Liable As Control Persons Under Section 15 of the Securities Act.

Plaintiff also asserts a controlling person claim against the Individual Defendants under Section 15 of the Securities Act. Compl. ¶¶ 111-113. Section 15 of the Securities Act extends liability under certain circumstances to control persons of the entities that commit violations of that Act. 15 U.S.C. § 77o. As a threshold matter, there can be no liability under Section 15 because no violation of Section 11 occurred. Ehlert v. Singer, 245 F.3d 1313, 1320 (11th Cir. 2001) (affirming dismissal of Section 15 claim where "none of the defendants could be liable under §15 since there were no actual violators of the securities laws to be held liable with") (internal quotations and citations omitted); In re World Access, Inc., 310 F. Supp. 2d at 1300

---

[5]    Further, the undisputed evidence establishes that as regards the Company's audited financial statements, which were included in the Prospectus upon the authority of Ernst &Young LLP as an expert, the Individual Defendants had no reasonable ground to believe and did not believe, at the time such part of the Prospectus became effective, that the statements were untrue or omitted any material fact. SMF ¶ 27.

(Section 15 claim failed where there was no triable issue of fact as to whether a primary violation of securities law occurred). However, even if Plaintiff could establish a violation of Section 11 by the Company, the Individual Defendants are entitled to summary judgment on Plaintiff's Section 15 claim.

To hold a defendant liable as a control person, a plaintiff must establish that the defendant had: (1) the power to control the general affairs of the entity primarily liable for the Section 11 violation at the time of the violation, and (2) the power to directly or indirectly control or influence the specific policy that resulted in primary liability under Section 11. Brown v. Enstar Group, Inc., 84 F.3d 393, 396-97 (11th Cir. 1996); In re World Access, 310 F. Supp. 2d at 1291-92. Outside board members who do not participate in the day to day operations of the Company are not control persons. See Cameron v. Outdoor Resorts of Am., Inc., 608 F.2d 187, 195 (5th Cir. 1979) (Finding "director without effective day-to-day control and without knowledge … was not liable as a control person" under Section 20(a) of the Exchange Act.)[6] Here, the undisputed evidence establishes that the Independent Directors were not control persons. SMF ¶ 30. They were never employees of the Company and never participated in its day-to-day operations. Ackerman Decl., ¶ 5; Hilinski Decl., ¶ 3; Wenstrup Decl., ¶ 11.

Section 15 also provides that even if it is demonstrated that a person controls another who is liable under Section 11, the controlling person shall not be liable if he had "no knowledge of or reasonable grounds to believe in the existence of the facts by reason of which the liability of the controlled person is alleged to exist." 15 U.S.C. § 77o. Here, none of the Individual Defendants had knowledge of or reasonable ground to believe in the existence of facts by reason of which the liability of the Company is alleged to exist. SMF ¶¶ 31-32. This is clear from the same facts that demonstrate the Individual Defendants' due diligence.

## III.    Defendants Are Entitled To Summary Judgment Because No Genuine Issues Of Material Fact Exist As To Plaintiff's Exchange Act Claims.

To maintain a claim under Section 10(b) and Rule 10b-5, a plaintiff must prove: (i) a misstatement or omission (ii) of a material fact, (iii) made with scienter, (iv) upon which the

---

[6]    As this Court held previously, "the controlling person analysis under Section 15 of the Securities Act and Section 20(a) of the Exchange Act are identical." Motion to Dismiss Order at 15 n.5.

plaintiff relied, (v) that proximately caused the plaintiff's loss.  Theoharous v. Fong, 256 F.3d 1219, 1224 (11th Cir. 2001).

    **A.**    **The Company's Public Disclosures Did Not Contain Any Material Misstatement or Omission.**

        **1.**    **The Company's Statements Concerning the *De Novo* Program Were Not Misleading.**

As with his Securities Act Claims, the crux of Plaintiff's Exchange Act Claims is that Company's post-IPO Public Disclosures were materially misleading because MSN failed to disclose that the *de novo* program was "not succeeding," not generating "high growth" or "rapid EBITDA profitability," was "in shambles" and "teetering on the brink of suspension" and was consistently operating approximately 50% below "budget."  Compl. ¶212.

These claims cannot withstand summary judgment.  MSN's financial results, which were included in the Company's Public Disclosures, were accurate in all material respects.  SMF ¶ 37.  Those results demonstrate that the Company continued to perform very well in 2002 after the IPO and through the first quarter of 2003.  SMF ¶¶ 38-43.  Specifically, in 2002 and early 2003, the Company generated record revenues in each quarter as well as significant growth over the prior year.  SMF ¶ 38.  During this same period, the Company's EBITDA and operating income also increased both sequentially and year-over-year.  SMF ¶¶ 39-40.  The Company could not have achieved these financial results if the *de novo* program had not also been doing well or if demand for per diem nurses had not remained strong.[7]

---

[7]    Certain of the Company's Public Disclosures about which Plaintiff complains are, at worst, puffery.  As such, they are immaterial as a matter of law.  For example, Plaintiff alleges that the Company's statements that demand for temporary healthcare staffing remained "robust" or that the Company had "unparalleled success" with the *de novo* program were misleading.  Compl. ¶¶ 227-230; 237-38.  While these statements were accurate, they would not be actionable even if they had been overly optimistic or hyperbole.  Such generic statements are merely corporate expressions of optimism, and are not actionable.  See Rombach v. Chang, 355 F.3d 164, 174 (2d Cir. 2004) ("expressions of puffery and corporate optimism do not give rise to securities violations . . .  [people in charge of a company] can be expected to be confident about their stewardship and the prospects of the business that they manage."); In re Metris Cos., Inc. Sec. Litig., 428 F. Supp. 2d 1004, 1010 (D. Minn. 2006) (statements such as "business is on a much stronger profitability track than it has ever been" are "mere puffery, which could not possibly significantly alter the available mix of information in the mind of a reasonable investor.")

The undisputed evidence shows specifically that the Company's *de novo* program was doing extremely well. In 2002, revenues for the *de novo* program more than doubled from $90.9 million in 2001 to $183.3 million in 2002. SMF ¶ 45. The revenues of the 64 *de novo* branches opened in 2001 grew by almost 300% in 2002. SMF ¶ 45. Moreover, revenue for the *de novo* program in the first quarter of 2003 also increased from the same period in 2002. SMF ¶ 45. Operating income for the *de novo* program also grew in 2002 and continued to grow in the first quarter of 2003. SMF ¶ 46. Thus, the *de novo* branches contributed $15.6 million to MSN's 2002 operating income (up 136.4% from $6.6 million in 2001). SMF ¶ 46. In the first quarter of 2003, operating income increased by 59.4% over the first quarter of 2002. SMF ¶ 46. Moreover, there is no dispute that the Company achieved its goal of opening 40 *de novo* branches in 2002. SMF ¶ 19.

Plaintiff's sole basis for asserting that the *de novo* program was unsuccessful is the allegation that the *de novo* branches were "consistently" operating approximately 50% below the Company's internal budget. This assertion is flawed and, in any event, unsupported by the evidence.

The Company's internal budget, which was an aggregation of the individual branch budgets prepared annually by branch managers in consultation with their regional managers and vice-presidents, was never intended to be, and in fact was never, publicly disclosed.[8] Little Decl., ¶¶ 46-47. Rather, the internal budget was a tool used by senior management to motivate regional and branch level managers as it provided the targets by which the bonuses for these employees would be determined. Little Decl., ¶ 45. The aggregate of the internal branch budgets did not represent what management expected the Company to achieve.[9] Adamson Decl., ¶¶ 16-17; Little Decl., ¶¶ 40-49. Accordingly, the Company's internal budget is not an appropriate or relevant measure of the success of the *de novo* program. Instead, the success of

---

[8] Plaintiff's allegation that the Company's budgets were "deliberately manipulated" to "create the appearance of growth" is incorrect. The Company's budgets could not have been "manipulated" to create the "appearance of growth" because it is undisputed that they were never publicly disclosed. SMF ¶ 50; Stavroff, 987 F. Supp. at 997 (holding that since "[t]he Budget was not released to the public ... it cannot form the basis for any claim of being misled by public information").

[9] For that purpose, management developed, as described in section III.A.3 below, a financial model which formed the basis of the Company's publicly disclosed revenue and earnings guidance.

the *de novo* program is demonstrated by the financial results of that program including its growth and profitability through the first quarter of 2003 as well as the fact that it enabled the Company to meet its guidance during that period.

Moreover, there is no legal basis for Plaintiff's contention. It is well established that there is no duty to disclose internal projections and budgets or variances between such budgets and actual results. TAAM Assocs v. Housecall Med. Res., Inc., 1:96-CV-2214A-JEC, 1998 WL 1745361, at *6 (N.D. Ga. Mar. 31, 1998) (an issuer has no duty "to disclose forward-looking information, such as internal projections, estimates of future performance, forecasts, budgets, and similar data.") (emphasis added) (quoting Shaw v. Digital Equip. Corp., 82 F.3d 1194, 1209 (1st Cir. 1996)); In re Burlington Coat Factory Sec. Litig., 114 F.3d 1410, 1427 (3d Cir. 1997) ("The federal securities laws do not obligate companies to disclose their internal forecasts."); Saddle Rock Partners, Ltd. v. Hiatt, No. 95-2326 GA, 1996 WL 859986 at, *11 (W.D. Tenn. Mar. 26, 1996) (agreeing with defendants that "companies are under no independent obligation to disclose internal projections" and dismissing claims based "upon comparisons between accurately reported financial results and [the company's] internal forecast" because "discrepancies between actual results and internal projections are immaterial as a matter of law") (citing In re Worlds of Wonder Sec. Litig., 35 F.3d 1407, 1419 (9th Cir. 1994)).

Finally, Plaintiff's claim that the Company's *de novo* program was operating at 50% below internal budgets is factually flawed. The undisputed evidence demonstrates that at no time during the Class Period was the *de novo* program operating at anywhere close to 50% below budget. SMF ¶ 47.

## 2. The Company's Statements Concerning Its Gross Margins Were Not Misleading.

Plaintiff's allegation that the Company failed to disclose that it was experiencing "severe gross margin compression" is not supported by the evidence. The evidence demonstrates that the Company accurately disclosed its gross margins in each of its SEC filings and press releases. SMF ¶ 49. Therefore, any assertion that that information was concealed is plainly without merit. Further, while those numbers indicated that the Company's gross margins had declined from 25.5% in the first quarter of 2002 to 24.7% in the fourth quarter, that decline was relatively small

-14-

and belies the notion that the Company was experiencing any "severe gross margin compression." SMF ¶ 48.

### 3.    The Company Had A Reasonable Basis for Issuing Its Revenue and Earnings Guidance.

The Complaint alleges that the Company's publicly disclosed revenue and earnings guidance was without "reasonable basis," "arbitrary and severely manipulated." Compl. ¶¶ 230, 251. There is no evidence to support this allegation. On the contrary, the undisputed evidence demonstrates that the Company exceeded its revenue guidance for fiscal year 2002, including the fourth quarter. SMF ¶ 55. Excluding a one-time charge taken in connection with an unexpected client bankruptcy (which was disclosed by the Company in a timely manner on January 31, 2003), the Company met its earnings guidance for 2002, including the fourth quarter, as well. SMF ¶ 55. The Company also met the guidance it issued for the first quarter of 2003. SMF ¶ 55.

With respect to the Company's guidance for fiscal year 2003, which was revised downwards by the Company in June 2003 as a result of the restructuring, the evidence reflects that the Company had a reasonable basis for issuing it at the time it was disclosed. SMF ¶ 54. The guidance for fiscal year 2003 was first issued by the Company in July 2002 at the same time it issued guidance for fiscal year 2002.[10] SMF ¶ 51. The guidance was derived from a financial model developed by Defendant Little. Little Decl., ¶ 43. That model projected the Company's future earnings and revenues based on an analysis of the historical performance of the Company's operations and management's assessment of market conditions. Little Decl., ¶ 44. There is no evidence that the estimates contained in the guidance were made without reasonable basis. SMF ¶ 54. Stavroff, 987 F. Supp. at 995 (granting summary judgment for defendants on plaintiff's claim that defendants' predictions of future growth were misleading where company's "recent past performance provided a reasonable basis for such predictions").

---

[10]    In dismissing the Section 10(b) claims relating to disclosures prior to October 29, 2002, this Court noted that Plaintiff had not adequately alleged scienter with respect to such disclosures. Motion to Dismiss Order at 21. The Company's 2003 guidance that Plaintiff attacks was first issued in July 2002, at a time during which the Court found no scienter had been shown. Thus, the Court's ruling essentially mandates dismissal of Plaintiff's guidance claims which are dependent upon a showing of actual knowledge by Defendants that those forward-looking statements were false when made. See Motion to Dismiss Order at 26.

In its October 29, 2002 press release, the Company slightly revised its guidance for fiscal year 2003, increasing its earnings estimate by one cent to between 91 and 93 cents per diluted share. Little Decl., ¶ 42. This revision reflected the Company's acquisition of Pharmstaff, Ltd., a provider of temporary pharmacists and pharmacy technicians, which was also disclosed in the October 29 press release. Little Decl., ¶ 42. The undisputed evidence is that the Pharmstaff acquisition in fact did contribute one cent per diluted share to the Company's earnings in 2003 and thus the Company had a reasonable basis for increasing its guidance in October 2002. Little Decl., ¶ 42.

To the extent Plaintiff is alleging that the Company's guidance was without reasonable basis because the *de novo* program was allegedly not meeting its internal budgets, that argument has no merit. The Company's revenue and earnings guidance was distinct from its internal budget. Little Decl., ¶ 45. As described above, the guidance was developed and issued even before the Company began its 2003 budget process and was based on a financial model developed by Defendant Little. Little Decl., ¶ 43. Unlike the internal budget, the guidance was prepared on a company-wide basis and represented what management believed the Company could reasonably achieve. Little Decl., ¶¶ 43-44. Significantly, the estimates contained in the guidance were substantially lower than those in the Company's internal budget. SMF ¶ 53. There is no legal basis for Plaintiff's assertion that the Company's alleged failure in 2002 to meet its higher internal budget numbers indicates that its guidance was made without reasonable basis. Stavroff, 987 F. Supp. at 997 (granting summary judgment to defendants on plaintiffs' section 10(b) claim and holding that "[p]laintiffs' reliance on the fact that [the issuer] failed to meet the goals set forth in the FY93 Budget [and other internal documents] as proof of an intent to deceive the market is simply incorrect. The fact that [the issuer] did not meet the goals in these [] documents cannot be interpreted to mean that it knew it would not meet its decidedly lower public projections . . . which had a reasonable basis in history and fact.")

Finally, the Company's revenue and earnings guidance is protected by the Reform Act's safe harbor provisions. The Company's guidance was accompanied by meaningful cautionary

language which protects those statements from liability under Section 10(b).[11]  SMF ¶ 56; 15
U.S.C. §78u-5(c)(1)(A)(i); <u>Harris v. Ivax Corp.</u>, 182 F.3d 799, 803 (11th Cir. 1999), <u>reh'g.</u>
<u>denied</u>, 2000 WL 430031 (11th Cir. Apr. 20, 2000).  Moreover, even if the meaningful
cautionary language were not present, there is no evidence that Defendants Adamson and Little
had actual knowledge that the Company's guidance or any other forward looking statement
contained in the Company's Public Disclosures was false or misleading when made.  SMF ¶ 57;
<u>In re Rexall Sundown, Inc. Sec. Litig.</u>, No. 988798-CIV-DIMITROULEAS, 2000 WL
33539428, at * 2 (S.D. Fla. Mar. 29, 2000) ("[E]ven if the forward-looking statement has no
accompanying cautionary statement, a plaintiff must prove that the defendant made the forward-
looking statement with actual knowledge that it was false or misleading.")  On the contrary, it is
undisputed that they both believed the assumptions on which the guidance was based were
reasonable.  SMF ¶ 54.  Accordingly, the guidance cannot form the basis for liability under
Plaintiff's Exchange Act Claims.  <u>See</u> <u>Theoharous</u>, 256 F.3d at 1224-25 (affirming dismissal of
Section 10(b) claims in the absence of facts indicating that defendant knew forward-looking
statements were false).

> **4.    The Company's Statements Concerning Its Restructuring and Branch
>          Closures Were Not Misleading.**

The Complaint alleges that the Company's Public Disclosures in February and March
2003 were misleading because Defendants knew that the Company would be closing numerous
branch offices and that the decision to close the offices was made in January 2003.  Compl. ¶¶
251, 255, 267.  The evidence does not support these allegations.  Instead, the undisputed facts
demonstrate that the Company first decided to suspend further *de novo* branch openings and
restructure its operations in late April or early May 2003.  SMF ¶ 60.  Thereafter, the Company
promptly announced the restructuring in its May 12, 2003 press release.  Compl. ¶263.  The

---

[11]    For example, the October 29, 2002 release in which the Company announced it was upwardly revising its
earnings guidance for 2003 contained the warning that: "Some important factors that could have a
significant impact on the Company's operations and financial results, and could cause the Company's
actual results or outcomes to differ materially from those discussed in the forward-looking statements
include, but are not limited to" various specific factors, including the Company's ability to enter into
contracts with clients on terms favorable to it, the effect on the Company of competition in the markets, and
the Company's ability to carry out its business strategy.  <u>See</u> Advani Decl. Ex. 2, Oct. 29, 2002 Press
Release.

undisputed evidence further indicates that the Company did not decide on the number and
identity of branches to be closed until middle to late May 2003. SMF ¶ 60. On June 16, 2003,
MSN issued a press release disclosing the number of branches that were closed and the amount
of the restructuring charge it incurred as a result. Compl. ¶268.

     **5.     The Company's 2002 Form 10-K Did Not Contain Any Other
           Material Misrepresentations or Omissions.**

     Plaintiff alleges that the Company's 2002 Form 10-K, filed with the SEC on March 28,
2003, was misleading because the Company did not interview all nurse applicants in person in
every instance. Compl. ¶ 256. The undisputed evidence shows that the Company's policy
required that such interviews take place. Little Decl., ¶ 63. Further, there is no evidence to show
that any deviation from this policy affected the Company's financial results in any material way.
Little Decl., ¶ 63. Accordingly, such instances, if any, would not constitute material information
required to be disclosed by the Company. <u>Longman v. Food Lion, Inc.</u>, 197 F.3d 675, 686 (4th
Cir. 1999) (affirming summary judgment for defendants and agreeing with district court that "to
the extent that there is any omission by Defendants in their Annual and Quarterly Reports of
isolated instances of workplace errors, this omission not only is not material as required by §10b
but also could not make any affirmative statements misleading in Defendants' Annual and
Quarterly Reports").

     Plaintiff further alleges that the 2002 Form 10-K was misleading because MSN "violated
federal licensing regulations to such an extent that it impaired contracts and contractual relations
with its clients." Compl. ¶257. This claim is also not supported by any evidence. MSN is not
subject to any federal licensing regulations. Little Decl., ¶ 64. Moreover, there is no evidence
that any of the Company's actions on which Plaintiff purports to base his claim affected the
Company's financial results in any material way. Little Decl., ¶ 64.

     Finally, the Complaint alleges that the 2002 Form 10-K was misleading because MSN
failed to disclose "contingent liabilities and significant risks and uncertainties in conformity with
GAAP." Compl. ¶ 258. Plaintiff can point to no evidence of any contingent liabilities or
significant risks and uncertainties which were required to be disclosed and were not. To the
extent that Plaintiff is claiming that the Company's 2002 financial statements, which were

-18-

audited by Ernst & Young LLP and included in the 2002 Form 10-K, did not accurately state the
Company's accounts receivable, this claim is not supported by any evidence. Rather, the
undisputed evidence shows that the balance sheet contained in the 2002 Form 10-K accurately
reflected the Company's actual accounts receivable net of a reasonable allowance for doubtful
accounts. Little Decl., ¶ 65. With the exception of the one-time $3.8 million charge associated
with an unexpected client bankruptcy described above, the amount of write-offs did not exceed
the reserves established by the Company in either 2002 or 2003 or otherwise materially affect the
Company's financial results. Little Decl., ¶ 65.

**B.    None of The Defendants Acted With Scienter.**

To establish scienter in this Circuit, Plaintiff must prove that each Defendant acted in a
severely reckless fashion. As this Court previously held, severe recklessness is "limited to those
highly unreasonable omissions or misrepresentations that involve not merely simple or even
inexcusable negligence, but an extreme departure from the standards of ordinary care, and that
present a danger of misleading buyers or sellers which is either known to the defendant or is so
obvious that the defendant must have been aware of it." Motion to Dismiss Order at 19 (quoting
Bryant v. Avado Brands, Inc., 187 F.3d 1271, 1282 n.18 (11th Cir. 1999)).

It is undisputed that neither Adamson nor Little sold any MSN stock during the Class
Period and Plaintiff can point to no evidence of any other motive these Defendants may have had
to mislead the public. SMF ¶ 61. The absence of motive is an important factor in determining
the existence of scienter. Schuster v. Symmetricon, Inc., Civ. No. C94 20024 RMW, 2000 WL
33115909, at *8 (N.D. Cal. Aug. 1, 2000) (finding evidence that key insiders did not sell stock
"negate[d] any reasonable inference of scienter, and require[d] entry of summary judgment in
favor of defendants"). Further, there is no evidence that either Adamson or Little acted in a
severely reckless fashion with respect to any of the allegedly misleading statements concerning
the *de novo* program or the Company's financial performance. SMF ¶ 62. In fact, as described
above, the Company as a whole, and the *de novo* program in particular, was doing very well in
2002 and early 2003 and there is no evidence that Adamson or Little knew, or should have
known, of any facts that were required to be disclosed and were not. SMF ¶¶ 38-60.
Accordingly, there remains no genuine issue of fact as to these Defendants' lack of scienter and
summary judgment is appropriate. In re Miller Indus. Sec. Litig., 120 F. Supp. 2d 1371, 1383

-19-

(N.D. Ga. 2000) (granting summary judgment where plaintiffs failed to present evidence that defendants' acts were "an extreme departure from the standards of ordinary care"); In re Metris Cos., Inc., 428 F. Supp 2d at 1013 (finding insufficient evidence of scienter and granting summary judgment for defendants where plaintiffs "have not, and cannot, show defendants' statements were unreasonable or dangerous to potential investors").

IV.  **Plaintiff's Control Person Claims Against Defendants Adamson and Little Under Section 20(a) Must Be Dismissed.**

Plaintiff also claims that Adamson and Little are liable under Section 20(a) of the Exchange Act as controlling persons of the Company.  Because, as demonstrated above, there is no evidence that the Company violated Section 10(b), the control person claim must be dismissed as well.  In re World Access, Inc., 310 F. Supp. 2d at 1300 (Section 20(a) claim failed where there was no triable issue of fact as to whether a primary violation of securities law occurred); In re Metris Cos., Inc., 428 F. Supp 2d at 1014 (same).

Additionally, Adamson and Little acted in good faith and did not directly or indirectly induce the act or acts constituting the alleged violation.  SMF ¶ 63.  The undisputed evidence cited above which negates Plaintiff's contention that Adamson and Little acted with severe recklessness also demonstrates that they acted in good faith and mandates the dismissal of the control person claims against them.  Donohoe v. Consol. Operating & Prod. Corp., 30 F.3d 907, 912 (7th Cir. 1994) (holding that under "good faith" defense "[t]he controlling person must also act recklessly; negligence alone is insufficient" and affirming summary judgment for defendants on plaintiff's control person claim because there was no "genuine issue of fact regarding the defendants' recklessness").

**CONCLUSION**

For the reasons stated above, Defendants are entitled to summary judgment and dismissal of the Complaint with prejudice.

Dated: December 1, 2006
Miami, Florida

Respectfully submitted,

s/Harry R. Schafer
Stanley H. Wakshlag, Esq. (Florida Bar No.
266264)
swakshlag@kennynachwalter.com
Harry R. Schafer, Esq. (Florida Bar No. 508667)
hschafer@kennynachwalter.com
**KENNY NACHWALTER, P.A.**
1100 Miami Center
201 South Biscayne Blvd.
Miami, FL 33131
Telephone:  (305) 373-1000
Facsimile:  (305) 372-1861

- and -

Stephen W. Greiner, Esq. (*Pro Hac*)
sgreiner@willkie.com
Sameer Advani, Esq. *(Pro Hac)*
sadvani@willkie.com
**WILLKIE FARR & GALLAGHER LLP**
787 Seventh Avenue
New York, New York  10019-6099
Telephone: (212) 728-8000
Facsimile : (212) 728-8111

*Attorneys for Defendants*

*3481820*

## CERTIFICATE OF SERVICE

I hereby certify that on December 1, 2006, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF. I also certify that the foregoing document is being served this day on all counsel of record or pro se parties identified on the attached Service List in the manner specified, either via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

s/ Harry R. Schafer

**SERVICE LIST**

**Marrari v. Medical Staffing Network Holdings, Inc., et al.**
**Case No. 04-80158-CIV-DIMITROULEAS/LYNCH**

| | |
|---|---|
| Jack Reise, Esq. <br> jreise@lerachlaw.com <br> Robert J. Robbins, Esq. <br> rrobbins@learchlaw.com <br> LERACH COUGHLIN STOIA GELLER <br>   RUDMAN & ROBBINS LLP <br> 120 East Palmetto Park Road - Suite 500 <br> Boca Raton, FL 33432 <br> Telephone: 561/750-3000 <br> Facsimile: 561/750-3364 <br><br> **Attorney for Lead Plaintiffs** <br> **and the Class** <br> [Via CM/ECF electronic filing] | Stanley H. Wakshlag, Esq. <br> swakshlag@kennynachwalter.com <br> Harry R. Schafer, Esq. <br> hschafer@kennynachwalter.com <br> KENNY NACHWALTER, P.A. <br> 1100 Miami Center <br> 201 South Biscayne Blvd. <br> Miami, FL 33131-4327 <br> Telephone: 305/373-1000 <br> Facsimile: 305/372-1861 <br>     - and - <br> Stephen W. Greiner, Esq. (*Pro Hac*) <br> sgreiner@willkie.com <br> Sameer Advani, Esq. (*Pro Hac*) <br> sadvani@wilkie.com <br> WILLKIE FARR & GALLAGHER LLP <br> 787 Seventh Avenue <br> New York, New York 10019-6099 <br> Telephone: 212/728-8000 <br> Facsimile: 212/728-8111 <br><br> **Attorneys for Defendants Medical Staffing** <br> **Network Holdings, Inc., Robert J. Adamson,** <br> **Kevin S. Little, Joel Ackerman, David J.** <br> **Wenstrup & Scott F. Hilinski** |