UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 04-80158-CIV-DIMITROULEAS/LYNCH

JOSEPH AND PATRICIA MARRARI, on
behalf of themselves and all others similarly
situated,

    Plaintiffs,

vs.

MEDICAL STAFFING NETWORK
HOLDINGS, INC., et al.

    Defendants.

_____

DEFENDANTS' STATEMENT OF MATERIAL FACTS AS
TO WHICH THERE IS NO GENUINE ISSUE TO BE TRIED

Pursuant to Fed. R. Civ. P. 56.1 and S.D. Fla. L.R. 7.5.C, Medical Staffing Network Holdings, Inc. ("MSN" or the "Company"), Robert J. Adamson, Kevin S. Little, Joel Ackerman, David J. Wenstrup and Scott F. Hilinski (collectively, the "Defendants"), by their undersigned attorneys, respectfully submit in support of their motion for summary judgment filed herewith the following statement of material facts as to which there is no genuine issue to be tried.

### Defendants

1. MSN is a provider of temporary healthcare staffing services and has its headquarters in Boca Raton, Florida. (Compl. ¶ 3.)

2. During the period April 18, 2002 to June 16, 2003 (the "Class Period"), Defendant Robert J. Adamson was a director of MSN and its Chairman and Chief Executive Officer. (Compl. ¶ 16.)

3. During the Class Period, Defendant Kevin S. Little was the Chief Financial Officer of MSN. (Compl. ¶ 17.)

4. During the Class Period, Defendants Joel Ackerman, David J. Wenstrup and Scott F. Hilinski were directors of MSN. (Compl. ¶¶ 18-20.)

### Background

5. MSN is a supplemental healthcare staffing company founded in 1998 that provides hospitals and other healthcare facilities with staffing services, including per diem nurses, travel nurses, and allied professionals. (Compl. ¶ 3.)

6. Per diem assignments are assignments lasting up to 13 weeks. (Compl. ¶ 58.) Per diem nurse staffing represented approximately 75% and 76% of MSN's revenues in 2001 and 2002, respectively. (Compl. ¶ 58.)

7. The Company's per diem staffing business is operated through a network of branches located throughout the United States. (Little Decl., ¶ 3.)[1] As of December 31, 2001,

---

[1] The Declarations of Robert J. Adamson, Kevin S. Little, Joel Ackerman, David J. Wenstrup, Scott F. Hilinski, Raymond Cooper and Sameer Advani filed concurrently herewith are referred to herein as the "Adamson Decl.," "Little Decl.," "Ackerman Decl.," "Wenstrup Decl.," "Hilinski Decl.," "Cooper Decl." and "Advani Decl.," respectively.

1

the Company had 136 branches. (Little Decl., ¶ 6.) As of December 29, 2002, the Company had over 180 branches. (Little Decl. ¶ 6.) Branches opened by the Company, as opposed to those acquired from third-parties, are known as *de novo* branches. (Compl. ¶¶ 5, 60.) From its inception in 1998 through the end of 2002, the Company opened 138 *de novo* branches, including 30 in 2000, 64 in 2001 and 40 in 2002. (Compl. ¶ 60.)

### Claims Under Section 11 of the Securities Act

8. On April 18, 2002, the Company completed its initial public offering ("IPO"). (Compl. ¶ 4.) In connection with its IPO, the Company filed with the Securities and Exchange Commission ("SEC") a registration statement and prospectus (the "Prospectus"), which became effective on April 18, 2002.[2] (Compl. ¶ 4.)

9. At the time of the IPO, demand for temporary medical staffing services was strong and was expected to continue to grow. Demand for healthcare services was expected to rise due to, among other things, the aging U.S. population and advances in medical technology. At the same time, there was a growing shortage of nurses. (Little Decl., ¶ 8; Hilinski Decl.,¶ 8; Wenstrup Decl., ¶ 6; Cooper Decl., ¶ 8).

I.  **The Prospectus Did Not Contain Any Material Misrepresentation or Omission**

   A.  **The Financial Statements Contained in the Prospectus Were Accurate**

10. The Prospectus contained the Company's consolidated balance sheets as of December 31, 2000 and December 30, 2001 and the related consolidated statements of operations, changes in redeemable preferred stock and common stockholders' equity (deficit), and cash flows for each of the years ended December 31, 1999, 2000 and December 30, 2001 (the "Audited Financial Statements"), which were audited by Ernst & Young LLP ("E&Y") (Prospectus, at F-3-9). The Audited Financial Statements were included in the Prospectus with the consent of E&Y and upon its authority as an expert. (Prospectus, at F-2.) The Prospectus also included the Company's unaudited quarterly financial results for 2000 and 2001. (Prospectus, at 28-29.)

---

[2] A true and correct copy of the Prospectus is attached as Exhibit 1 to the Declaration of Sameer Advani filed herewith (the "Advani Decl.").

11. The financial statements included in the Prospectus were accurate in all material respects. (Little Decl., ¶ 23.)

12. The financial statements included in the Prospectus reflect, among other things, that the Company's service revenues increased from $96.5 million in 1999 to $182.0 million in 2000 (representing an 88.6% increase), and to $338.4 million in 2001 (representing an 85.9% increase). Income from operations increased from $5.0 million in 1999 to $10.6 million in 2000 (112.0% increase), and to $19.4 million in 2001 (83.0% increase). Earnings before interest, taxes, depreciation and amortization ("EBITDA") also increased from $7.1 million in 1999 to $14.4 million in 2000 (102.8% increase), and to $32.4 million in 2001 (125.0% increase). (Little Decl., ¶ 26.)

13. During the first quarter of 2002, immediately preceding the IPO, revenues grew by 46.4% over the first quarter of 2001 from $70.5 million to $103.2 million. Income from operations increased by 46.7% and EBITDA increased by 31.5% over the first quarter of 2001. (Little Decl., ¶ 27.)

### B. The Prospectus Did Not Misrepresent Any Facts Concerning The *De Novo* Program

14. At the time of the IPO, the *de novo* program, like the Company's operations as a whole, was successful. (Adamson Decl., ¶¶ 6-9; Little Decl., ¶ 31.)

15. The *de novo* branches opened between 1999 and 2001 exhibited rapid revenue growth and profitability. (Little Decl., ¶ 31.)

16. The *de novo* branches opened in 1999, generated $9.2 million in revenue in 2000, representing a 240.7% increase over their revenues in 1999 and $13.3 million in 2001, a 44.6% increase over their revenues in 2000. *De novo* branches opened in 2000, contributed $48.9 million in revenues in 2001 as compared to $10 million in 2000, representing a growth rate of 393.9%. Operating income for *de novo* branches increased by 547.5% in 2001 over 2000. (Little Decl., ¶ 31.)

17. *De novo* revenues in the first quarter of 2002 increased to $39.6 million representing a 173.1% increase over *de novo* revenues in the first quarter of 2001. Operating

income for the *de novo* branches in the first quarter of 2002 increased by 135.7% over the same period in 2001. (Little Decl., ¶ 31.)

18. The *de novo* program met or exceeded the Company's internal revenue budget for fiscal year 2001 and for the first quarter of 2002. (Little Decl., ¶ 32.)

19. At the time of the IPO, the *de novo* program was not "teetering on the brink of suspension". In 2002 and the first quarter of 2003, the Company opened 40 and 4 branches, respectively. (Little Decl., ¶ 33.)

20. At the time of the IPO, the Company utilized a variety of reasonable criteria to determine where its *de novo* branches should open. (Little Decl., ¶¶ 11-15.)

21. The Prospectus disclosed that in deciding where to open new *de novo* branches, the Company focused on "identifying management for the branch" and on selecting markets that "demonstrate[d] high demand for temporary medical staffing" and that "complement[ed the Company's] existing infrastructure." (Prospectus, at 3, 35).

22. At the time of the IPO, the Company was not facing severe pricing pressure and its gross margins had not declined. The Company's gross margins increased from 24.4% in 1999 to 25.5% in 2001 and remained on 25.5% during the first quarter of 2002, immediately prior to the IPO. (Little Decl., ¶ 28.)

23. The Prospectus accurately disclosed the Company's gross margins and its performance as of December 31, 2001. (Prospectus, at 25-26; Adamson Decl., ¶¶ 6-8; Little Decl., ¶ 23.)

24. At the time of the IPO, the per diem market was not negatively impacting the Company's growth prospects and overall performance. (Adamson Decl., ¶¶ 6-10; Little Decl., ¶¶ 25-34; Wenstrup Decl., ¶¶ 12-16; Cooper Decl., ¶¶ 8-17).

25. The Prospectus included numerous risk factors concerning the *de novo* program. (Prospectus, at 8-13.)

### C. The Prospectus Did Not Misrepresent Any Facts Concerning the Company's Internal Budgets and Projections

26. The Company's internal budgets could not have created the appearance of growth because they were not included in the Prospectus. (Adamson Decl., ¶ 11; Little Decl. ¶ 35).

## II. The Directors Exercised Adequate "Due Diligence" in Advance of the IPO

27. As regards the Audited Financial Statements which were included in the Prospectus upon the authority of E&Y as an expert, Ackerman, Hilinski, Wenstrup, Adamson and Little had no reasonable ground to believe and did not believe, at the time such part of the Prospectus became effective, that the statements were untrue or omitted any material fact. (Ackerman Decl., ¶ 6; Hilinski Decl., ¶ 16; Wenstrup Decl., ¶ 13; Adamson Decl., ¶ 6; Little Decl., ¶ 23.)

28. As regards the other statements in the Prospectus, Ackerman, Hilinski and Wenstrup had, after conducting a reasonable investigation, reasonable grounds to believe and did believe, at the time the Prospectus became effective, that the statements therein were true and did not omit any material facts. (Ackerman Decl., ¶ 9; Hilinski Decl., ¶ 20; Wenstrup Decl., ¶ 17.)

29. As regards the other statements in the Prospectus, Adamson and Little had, after conducting a reasonable investigation, reasonable grounds to believe and did believe, at the time the Prospectus became effective, that the statements therein were true and did not omit any material facts. (Adamson Decl., ¶ 5; Little Decl., ¶ 24.)

### Claims Under Section 15 of the Securities Act

30. At the time the Prospectus became effective, Ackerman, Hilinski and Wenstrup did not control the Company. (Ackerman Decl., ¶ 5; Hilinski Decl., ¶ 3; Wenstrup Decl., ¶ 11.)

31. Ackerman, Hilinski and Wenstrup had no knowledge or reasonable ground to believe in the existence of facts by reason of which the liability of the Company is alleged to exist. (Ackerman Decl., ¶ 9; Hilinski Decl., ¶ 20; Wenstrup Decl., ¶ 17.)

32. Adamson and Little had no knowledge or reasonable ground to believe in the existence of facts by reason of which the liability of the Company is alleged to exist. (Adamson Decl., ¶ 5; Little Decl., ¶ 24.)

5

### Claims Under Section 10(b) the Securities Exchange Act

**III.   The Company's Disclosures During the Period October 29, 2002 to June 16, 2003 Were Not False or Misleading**

33.    On October 29, 2002, MSN issued a press release announcing its financial results for the quarter ending September 29, 2002 (the "Third Quarter of 2002"). (Compl. ¶ 226.) On October 30, 2002, MSN hosted a conference call to discuss, among other things, the Company's financial results for the Third Quarter of 2002. (Compl. ¶ 231.) On November 13, 2002, the Company filed with the SEC its quarterly report on Form 10-Q for the Third Quarter of 2002. (Compl. ¶ 235.)

34.    On January 31, 2003, MSN issued a press release and filed a Form 8-K with the SEC announcing that it was taking a one-time charge as a result of the bankruptcy of one of its clients. (Compl. ¶ 237.)

35.    On February 18, 2003, MSN issued a press release announcing its financial results for the quarter ending December 29, 2002 (the "Fourth Quarter of 2002") and for Fiscal Year 2002. (Compl. ¶ 239.) On February 19, 2003, MSN hosted a conference call to discuss the Company's financial results for the Fourth Quarter of 2002 and Fiscal Year 2002. (Compl. ¶ 246.) On March 28, 2003, the Company filed with the SEC its annual report on Form 10-K for Fiscal Year 2002 (the "2002 Form 10-K"). (Compl. ¶ 252.) The 2002 Form 10-K included financial statements for Fiscal Year 2002, which were audited by E&Y. (Advani Decl. Ex. 8, 2002 Form 10-K, at F-1).

36.    On May 12, 2003, MSN issued a press release announcing its financial results for the quarter ending March 30, 2003 (the "First Quarter of 2003"). (Compl. ¶ 263.) On May 13, 2003, MSN hosted a conference call to discuss, among other things, the Company's financial results for the First Quarter of 2003. (Compl. ¶ 265.) On May 14, 2003, the Company filed with the SEC its quarterly report on Form 10-Q for the First Quarter of 2003.[3]

---

[3]    The public disclosures listed in paragraphs 33 to 36 are collectively referred to as the "Company's Public Disclosures." True and correct copies of the Company's Public Disclosures are attached as Exhibits 2 to 13 of the Advani Decl.

### A. The Financial Results Contained In the Company's Public Disclosures Were Accurate In All Material Respects

37. The financial results reported in the Company's Public Disclosures were accurate in all material respects. (Little Decl., ¶¶ 50-51.)

### B. The Company's Public Disclosures Did Not Misrepresent Any Material Facts

### Facts Concerning the *De Novo* Program

38. In 2002 and early 2003, the Company generated record revenues each successive quarter as well as significant growth over the prior year. In the second quarter of 2002, service revenues grew 11.9% over the first quarter of 2002 (40.0% over 2001). In the third quarter, service revenues grew 10.4% (35.2% over 2001) and in the fourth quarter service revenues grew 7.6% (44.6% over 2001). For 2002 as a whole, revenues grew 40.9% over 2001 revenues. In the first quarter of 2003, revenues increased 5.2% over the fourth quarter of 2002 (39.9% over the first quarter of 2002). (Little Decl., ¶ 53.)

39. In the second, third and fourth quarters of 2002, EBITDA increased 41.5%, 44.0% and 49.6% (excluding a one-time $3.8 million charge) over 2001, respectively. Excluding the $3.8 million charge, EBITDA for fiscal year 2002 grew 42.6% over 2001. In the first quarter of 2003, EBITDA increased 19.8% over the first quarter of 2002. (Little Decl., ¶ 54.)

40. The Company's operating income increased by 56.1% and 65.7% in the second and third quarters of 2002 over the same quarters in 2001, respectively. Excluding the one-time $3.8 million charge, operating income for the fourth quarter of 2002 and for full year 2002 increased by 68.1% and 56.8% over 2001, respectively. In the first quarter of 2003, operating income increased by 11.4% over the first quarter of 2002. (Little Decl., ¶ 54.)

41. The Company's per diem staffing business continued to be successful in 2002 and the first quarter of 2003. (Little Decl., ¶ 55.)

42. Per diem revenues in each quarter of 2002, for fiscal year 2002 and for the first quarter of 2003 grew substantially. In the second quarter of 2002, per diem revenues increased by 44.2% over the same period in 2001. In the third and fourth quarters of 2002, that growth was 40.7% and 44.2%, respectively. For the full year, 2002 per diem revenues increased 44.6% over

7

2001. Per diem revenues grew 29.8% in the first quarter of 2003 (over the same period in 2002). (Little Decl., ¶ 55.)

43.  In the second, third and fourth quarters of 2002, operating income for the Company's per diem operations increased by 23.7%, 32.2% and 48.1% over 2001, respectively. For the year as a whole, operating income grew by 34.2%. In the first quarter of 2003, per diem operating income increased by 35.1% over the first quarter of 2002. (Little Decl., ¶ 55.)

44.  The *de novo* program also continued to be successful in 2002 and the first quarter of 2003. (Adamson Decl., ¶¶ 12-13; Little Decl., ¶ 56.)

45.  *De novo* revenues more than doubled from $90.9 million in 2001 to $183.3 million in 2002. Revenues for the 64 *de novo* branches opened in 2001 grew from $24.7 million in 2001 to $97.3 million in 2002, representing a growth rate of 293.9%. *De novo* revenues grew 30.1% in the first quarter of 2003 (over the same period in 2002). (Little Decl., ¶ 56.)

46.  In 2002, *de novo* branches contributed $15.6 million to MSN's 2002 operating income (up 136.4% from $6.6 million in 2001). In the first quarter of 2003, *de novo* branch operating income increased by 59.4% over the first quarter of 2002. (Little Decl., ¶ 56.)

47.  The *de novo* program did not operate at 50% below the Company's internal budget. (Little Decl., ¶ 58.)

### Facts Concerning the Company's Gross Margins

48.  The Company did not experience severe margin compression during 2002. (Little Decl., ¶ 62.) To the contrary, the Company's gross margins declined only slightly from early 2002 to the end of that year. (Little Decl., ¶ 62.)

49.  The Company did not fail to disclose its gross margins or any declines that occurred. The Company's gross margins and its overall performance were accurately disclosed in the Public Disclosures. (Little Decl., ¶ 62; Advani Decl. Ex. 4, Form 10-Q for the Third Quarter of 2002, at 16-17, Ex. 8, 2002 Form 10-K, at 20-21, Ex. 11, Form 10-Q for the First Quarter of 2003, at 17-18.)

### Facts Concerning the Company's Internal Budgets

50. The Company's internal budgets did not create the appearance of growth because they were never publicly disclosed. (Adamson Decl., ¶ 15; Little Decl., ¶ 48.)

### Facts Concerning the Revenue and Earnings Guidance

51. In the October 29, 2002 press release, the Company issued its revenue and earnings guidance for the Fourth Quarter of 2002, reiterated its guidance for Fiscal Year 2002 and slightly increased its guidance for Fiscal Year 2003. (Advani Decl. Ex. 2, October 29, 2002 press release.) The Company had previously disclosed its guidance for Fiscal Years 2002 and 2003 on July 30, 2002. (Little Decl. ¶ 41.) In the February 18, 2003 press release and during the February 19, 2003 conference call, the Company issued its revenue and earnings guidance for the First Quarter of 2003. (Advani Decl. Ex. 6, February 18, 2003 press release, Ex. 7, February 19, 2003 conference call transcript.)

52. In a press release issued on June 16, 2003, the Company revised its guidance for 2003 downwards. (Little Decl. ¶ 70.)

53. The Company's publicly disclosed revenue and earnings guidance was developed in a different manner and for a different purpose than the Company's internal budget and was substantially lower than the Company's aggregate internal budget figures (which were never disclosed to the public). (Adamson Decl., ¶¶ 16-17; Little Decl., ¶¶ 40-48.)

54. The assumptions upon which the publicly disclosed guidance was based were reasonable, and the Company had a reasonable basis for issuing the guidance. (Adamson Decl., ¶ 17; Little Decl., ¶¶ 42-44.)

55. The Company exceeded its revenue guidance, and excluding a one-time charge for an unexpected client bankruptcy, met its earnings guidance for 2002, including the fourth quarter. The Company also met its guidance for the first quarter of 2003. (Little Decl., ¶ 44.)

56. The Company's publicly disclosed revenue and earnings guidance was accompanied by meaningful cautionary statements. (Advani Decl. Ex. 2, October 29, 2002 press release, Advani Decl. Ex. 6, February 18, 2003 press release.)

57. Adamson and Little did not have actual knowledge that the Company's guidance or any other forward-looking statement contained in the Company's Public Disclosures was false or misleading when made. (Adamson Decl., ¶¶ 16-19; Little Decl., ¶¶ 42-44, 50-51.)

58. The revised revenue and earnings guidance for 2003 disclosed by the Company in the June 16, 2003 press release was not finalized until shortly before June 16, 2003. (Adamson Decl., ¶ 22; Little Decl., ¶ 71.)

### Facts Concerning other Alleged Misrepresentations or Omissions in the Company's 2002 Form 10-K

59. The Company's 2002 Form 10-K did not contain any material misrepresentation or omissions concerning contingent liabilities or significant risks and uncertainties required to be disclosed under GAAP, the Company's policy that all nurses be interviewed in person or the Company's compliance with federal licensing regulations. (Little Decl., ¶¶ 63-65.)

### Facts Concerning the Company's Restructuring

60. The Company first determined to restructure its operations in late April or early May 2003 and did not decide on the number and identity of branches to be closed until middle to late May, 2003. (Adamson Decl., ¶¶ 20-22; Little Decl., ¶¶ 66-68.)

IV. **There Is No Evidence of Scienter**

61. Adamson and Little did not sell any MSN stock during the Class Period and did not have any other motive for misleading the public. (Adamson Decl., ¶ 3; Little Decl., ¶ 5.)

62. Adamson and Little did not act in a severely reckless fashion with respect to the statements contained in the Company's Public Disclosures. (Adamson Decl.; Little Decl.)

### Claims Under Section 20(a) of the Exchange Act

63. Adamson and Little had a good faith belief that the statements in the Company's Public Disclosures were true and accurate and did not omit to state any material facts. (Adamson Decl., ¶ 19; Little Decl., ¶ 51.)

Dated: December 1, 2006
Miami, Florida

        Respectfully submitted,

        s/Harry R. Schafer
        Stanley H. Wakshlag, Esq. (Florida Bar No. 266264)
        swakshlag@kennynachwalter.com
        Harry R. Schafer, Esq. (Florida Bar No. 508667)
        hschafer@kennynachwalter.com
        **KENNY NACHWALTER, P.A.**
        1100 Miami Center
        201 South Biscayne Blvd.
        Miami, FL 33131
        Telephone: (305) 373-1000
        Facsimile: (305) 372-1861

        - and -

        Stephen W. Greiner, Esq. (*Pro Hac*)
        sgreiner@willkie.com
        Sameer Advani, Esq. *(Pro Hac)*
        sadvani@wilkie.com
        **WILLKIE FARR & GALLAGHER LLP**
        787 Seventh Avenue
        New York, New York 10019-6099
        Telephone: (212) 728-8000
        Facsimile : (212) 728-8111

        ***Attorneys for Defendants***

*3442014*

**CERTIFICATE OF SERVICE**

I hereby certify that on December 1, 2006, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF. I also certify that the foregoing document is being served this day on all counsel of record or pro se parties identified on the attached Service List in the manner specified, either via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

s/ Harry R. Schafer

## SERVICE LIST

### Marrari v. Medical Staffing Network Holdings, Inc., et al.
### Case No. 04-80158-CIV-DIMITROULEAS/LYNCH

| | |
|---|---|
| Jack Reise, Esq.<br>jreise@lerachlaw.com<br>Robert J. Robbins, Esq.<br>rrobbins@learchlaw.com<br>LERACH COUGHLIN STOIA GELLER<br> RUDMAN & ROBBINS LLP<br>120 East Palmetto Park Road - Suite 500<br>Boca Raton, FL 33432<br>Telephone: 561/750-3000<br>Facsimile: 561/750-3364<br><br>**Attorney for Lead Plaintiffs**<br>**and the Class**<br>[Via CM/ECF electronic filing] | Stanley H. Wakshlag, Esq.<br>swakshlag@kennynachwalter.com<br>Harry R. Schafer, Esq.<br>hschafer@kennynachwalter.com<br>KENNY NACHWALTER, P.A.<br>1100 Miami Center<br>201 South Biscayne Blvd.<br>Miami, FL 33131-4327<br>Telephone: 305/373-1000<br>Facsimile: 305/372-1861<br>       - and -<br>Stephen W. Greiner, Esq. (*Pro Hac*)<br>sgreiner@willkie.com<br>Sameer Advani, Esq. (*Pro Hac*)<br>sadvani@wilkie.com<br>WILLKIE FARR & GALLAGHER LLP<br>787 Seventh Avenue<br>New York, New York 10019-6099<br>Telephone: 212/728-8000<br>Facsimile: 212/728-8111<br><br>**Attorneys for Defendants Medical Staffing**<br>**Network Holdings, Inc., Robert J. Adamson,**<br>**Kevin S. Little, Joel Ackerman, David J.**<br>**Wenstrup & Scott F. Hilinski** |